## ROBERT EARP'S WILL.

When the intention of a testator can be clearly ascertained from the whole, it is always the law of the case, unless such intention conflicts with certain general rules limiting the extent of testamentary power.

If *one* construction manifestly tends to destroy the symmetry of the will, and to produce results inconsistent with the whole scheme of the disposition of the testator's property as proposed by him; another harmonizes all his dispositions and accomplishes his intentions in its results; the latter is generally found to be the true will of the testator. In giving such a construction, a Court should call to their aid the circumstances under which the will of the testator has been made, the state of his property, his family, and the like.

When a bequest is made to a wife of an annual sum in lieu of her dower, it is a charge on the whole estate, where no particular fund is provided for its payment. A preference is given to her over all other legatees; for her election to accept the legacy places her in the situation of a purchaser for a valuable consideration of what is given her by the will.

Where the annuity is charged on a particular fund, both the principal and interest of the fund are applicable to its payment; though other legatees may be disappointed by the diminution of the principal.

If, however, the interest of the fund on which an annuity in lieu of dower is charged, is adequate to its payment, the principal must be left intact to respond to the other legatees over.

Where a testator by his will gives an annuity out of a piece of land, but does not in terms make it a charge upon the rents; *yet it will be so,* and fall first upon the life-estate, and any deficiency will remain a charge on the fee and be raised thereout.

The bequest of a specific sum by a testator, as a special partner in business, carries with it the accruing profits, if any existed, where it is a continuing partnership, and the legatee takes such interest whether enhanced in value by profits, or diminished by losses.

Where interest is due on the public debt, and the annuitant dies before the day of payment arrives, it will go to the remainder-man, and cannot be apportioned.

In cases of mortgage investments the rule is different, and in such cases the interest accruing between the respective days of payment has been apportioned between the tenant for life and the remainder-man. The distinction between mortgages and funded debts is clearly recognised, because interest on a mortgage becomes due *from day to day,* and the mortgagee may call in his money when he pleases, and the interest must be computed up to that day, as no particular time is fixed. But the law fixes the time of payment on funded debts.

*June* 4. THIS case came before the Court on exceptions to the report of an auditor; various questions were considered, which it is deemed not necessary to introduce into a statement of the case. A copy of the three several items in the will of Robert Earp, deceased,

on which the Court expressed an opinion, is all which it is believed the reader will require for a clear understanding of the points decided by the Court.

"I give and bequeath unto my beloved wife, Mary Ann Earp, all my household furniture, silver-plate, whatsoever absolutely, to be disposed of as she may think proper, and also the annual sum of three thousand dollars, to be paid to her in four equal quarterly payments, by my said hereinafter-named executors, out of my residuary estate, during her natural life."

"My will and desire is, that the business of the firm of Earp & Brink shall be continued as it now is until the 1st day of January, 1849, and no longer. And I hereby direct my said executors, in case of my death before that period, to charge the sum of twenty thousand dollars put into the business of said firm by me as a special partner, together with the interest thereof, to be estimated semi-annually to my son, George Earp, Jr., as a part of his share of my residuary estate hereinafter disposed of. And I do also hereby authorize and direct my said executors upon my decease to charge any sums of money, stocks, or loans, which I may at any time have advanced to my son, Robert Earp, Jr., as shall appear by my books, together with interest estimated as aforesaid, to his account, as part of his share of my residuary estate."

"Tenth: I hereby give, devise, and bequeath all the rest, residue, and remainder of my estate, whatsoever and wheresoever, real and personal, unto my said hereinafter-named executors, their heirs, executors, administrators, and assigns, to and for their only proper use and behoof for ever, in trust nevertheless, to and for the following uses, interest, and purposes, viz. in trust to collect the rents, incomes, and interests, and to pay one equal fourth part thereof unto my brother, Thomas Earp, for the use and benefit of my son, Robert Earp, Jr., during his natural life; and one equal fourth part thereof unto each of my other three children (naming them), during their *natural* lives respectively, and upon the decease of either of my said children, their interest as respects one equal fourth part of the principal of my said residuary estate to grant, convey, assign, and transfer the same unto such person or persons as such deceased child may direct or appoint by any last will or writing, in the nature of a last will to be by him or her executed in the presence of two or more credible witnesses; but in case of the decease of my said son Robert without regaining the use of his reason, then in trust as respects the one equal fourth of my said residuary estate, to and for the only

proper use and behoof of his surviving sisters and brothers, under and subject to the trust hereby declared of and concerning the other three-fourths of my said residuary estate," &c., &c.

The testator died on the 17th day of November, 1848, leaving an estate valued at about $200,000.

The cause was argued by Mr. *Randall* for the exceptions, and by Mr. *E. K. Price* in support of the auditor's report.

It was contended by Mr. *Randall* : 1. That the legacy of $3000 to the wife was to be paid out of the residuum or a general fund of the estate, and not out of the annual income arising therefrom ; that such was the intention of the testator. 2. That George Earp, Jr., in the legacy left to him, was entitled not only to the $20,000 put into the firm of Earp & Brink by his father as a special partner, but also to all the profits made by said firm up to its dissolution, if any had been made; and cited 2 Keen, 274; Harcourt *v.* Morgan, 4 You. & Col. 312; Park *v.* Marchand, 1 Harper's Reps. 124; 2 Willis on Exec. 1232–3; 3 Penna. Reps. 384. 3. That the dividends due on bank-stock and on money, and on stock in the Crane Iron Works, which had fallen due, but not paid before the death of the testator, should not go into the residuary estate; that the dividends should be apportioned. He cited 2 P. W. 502, 176; 3 Atk. 260, 502; 3 Brown, 101; 2 Vesey, Sr. 677; 1 Swanst. 349; 4 Beavan, 549. 4. That the shares in Lehigh Crane Iron Works, incorporated under the Act of the 16th of June, 1836, were real estate. That all stock held either in railroads, canals, or turnpike roads, were real estate, and the interest or property which the holders of the stock held therein was to be treated as real estate in Pennsylvania; that such was the common law upon the subject,. and we had no statute altering it. To this point he cited 2 Vesey, Jr. 652; 3 Peere W. 357; 2 Ib. 137; Math. on Ex. 9; Law Journal, 127; 2 Conn. L. R. 567; Wells *v.* Cowles, 6 Dana, 167; 4 New Hamp. Rep. 480; 16 Wend. 328; 4 Ohio Rep. 515; 3 Paige, 302; 2 Watts, 443; 2 W. & S. 119; 4 Watts, 341; 3 Kent Com. 340, 402.

Mr. *Price*, in reply, contended, 1. That it was clear from the will that the testator meant that the $3000 to be paid to the widow should be taken from the annual income, and not from the principal. To hold otherwise, would destroy the equality of the distribution. That in years it might exhaust the whole estate, and then there would be no fund out of which to pay the annual sum.

2. I will not admit that dividends are ever apportioned, but when

declared they go to the executors; and when so declared, are a part of the assets of the estate: Cited 2 Ashm. 524–5; 4 Conn. Rep. 182. Interest on loans from corporations is calculated up to the death of the testator: 3 Atk. 444.

3. The stock in the Crane Iron Works is personal estate, and not real. It was the intention of the Act, authorizing such corporations, that it should be. It was an Act to encourage the manufacture of iron with mineral coal. The general meaning and design of the law was, that the shareholders were to have their interest as personal property. The 6th section of the statute gives authority to the executors and administrators of a deceased stockholder the right to vote, which would never have been the case if it was considered real estate. He cited Ward on Joint Stock Companies, 39 Law Lib. 288–9; top page, 171.

The opinion of the Court was delivered by

KING, President.—The testator in the first clause of his will gives the usual direction for the prompt payment of his debts and funeral expenses. In the second item, he bequeaths all his household furniture and plate absolutely to his wife, and "also the annual sum of $3000, to be paid to her in four quarterly payments, by his executors, out of his residuary estate, during her life." In the third, fourth, fifth, sixth, seventh, eighth, and ninth clauses, he gives various particular bequests and directions as to other portions of his estate. In the tenth item, he bequeaths "all the rest, residue, and remainder of his estate, *whatsoever* and *wheresoever*, to his executors in trust for the following purposes: To collect the rents, income, and interest thereof, and pay one equal fourth part to his brother, Thomas Earp, for the use of the testator's son, Robert Earp, while he shall remain of unsound mind, or to such person as shall from time to time be his trustee or committee; but in case he shall at any time regain the use of his reason, then and thenceforth to pay the same to his said son Robert, during his natural life; and one equal fourth part to his other three children, viz. Hannah Earp, Annie Earp, and George Earp, Jr., during their natural lives respectively. And upon the death of either of his said children, as respects his or her interest in *one equal fourth part of the principal of his said residuary estate*, to grant, convey, and transfer the same unto such person or persons as such deceased child may direct or appoint by any last will. But in case of the decease of his son Robert without regaining the use of his reason, then in

trust, as respects the one *equal* fourth part of his said residuary estate, to and for the use of his surviving brothers and sisters; under and subject to the trusts declared of and concerning the other three-fourths of his residuary estate. In case of the death of either of his said children, other than the said Robert, without making such an appointment, then in trust to grant, convey, and assign *one fourth part of the principal of his residuary estate* unto such person or persons as by the laws of Pennsylvania would have been entitled to the same, if the said child had been legally seised thereof in his or her right, and died intestate. In the final clause of the will a power is given to his executors to sell all or any part of his estate that they should deem expedient, and reinvest the same in certain designated public securities, or in real estate.

The first question presented to our consideration is, whether the annuity to Mrs. Earp is to be paid out of the income of the invested residue, or whether it is payable out of the principal of the estate. If payable out of the income of the estate, the annual income of each child will be diminished a sum equal to one-fourth of Mrs. Earp's annuity. If payable out of the principal of the estate, that principal will be diminished annually \$3000, for as long a period as Mrs. Earp may survive.

Our duty is to ascertain, as accurately as is practicable, what was the intention of the testator in this respect. That ascertained, gives the law of the case, when such intention does not conflict with certain general and qualifying rules, limiting the extent of testamentary power, which considerations of public policy have established. It is from the want of precision in the manner of expressing such intentions, that have arisen the almost infinity of cases that fill our law books in relation to the construction of wills. The difficulty in these cases does not so often arise from doubts existing as to the intention of the testator, looking at his will as a whole, as from the appearance of inconsistency between that whole and isolated and detached parts. When, however, from the want of accuracy and precision in the expression of a testator's intention, in a part of his will, the mind is embarrassed with doubts as to what that intention truly was in the particular item under consideration, we can derive most valuable assistance from viewing the instrument as a whole; from comparing one part with the other; and from ascertaining which of two proposed constructions of the equivocal and disputed item will best effectuate the testator's general intent. If one construction manifestly tends to destroy the symmetry of the will, and to produce results inconsistent with the

whole scheme of the disposition of his property proposed to himself by the testator, while another harmonizes all his dispositions and accomplishes all his intentions, we may feel reasonably assured that in the latter is to be found the true will of the testator.

We have also the right in such inquiries to call to our aid the circumstances under which the will of the testator has been made, the state of his property, his family, and the like: Powell on Devises, vol. 2, p. 6.

If the will of Robert Earp is tested by these clear and practical rules, there seems to be no real embarrassment in ascertaining his intention as to the fund from which the annuity to Mrs. Earp is to be paid.

It is admitted that the estate left by Mr. Earp is ample, and that the income of the residue, after satisfying his particular bequests, is adequate to pay the annuity bequeathed to his wife, and to furnish a generous provision for all his children. From the structure of this will, it is manifest that the testator had three leading objects in contemplation. The first, was the providing for his wife an adequate provision during her life. The second, the securing a similar independence to each of his children. And the third, the conservation of the principal of his estate, for distribution among his posterity, after the necessities and comforts of his immediate offspring had been duly cared for. How can these objects be best accomplished? Surely not by giving to his children all the income of his estate, and annually abstracting from the capital a sum equal to Mrs. Earp's annuity. Such a construction might defeat entirely, and certainly would affect some or all of the testator's most cherished objects. Although it is not a very probable, yet it is a possible event, that the annual abstraction of Mrs. Earp's annuity from the capital of the estate might absorb the greater portion of it, if her life should be greatly extended, and if the investments of the estate should happen to experience the deterioration which war civil or foreign, commercial convulsions, and similar national calamities have operated in other countries, and may operate in our own.

Is the exposure of Mrs. Earp's annuity to such contingencies, remote as perhaps they may be, the way to effect the intention of her husband, in securing her a munificent provision for life? Surely not. Again, as to the children; although the payment of their mother's annuity out of the principal of their father's estate would, for the present, increase their revenue, yet, after her death, this revenue would be reduced in proportion to the sum of the capital withdrawn to pay the annuity; an inconvenience which would

be greatly increased, if any such decrease of the aggregate of the capital should be accompanied with a deterioration in the productiveness of the securities. Was this result in the contemplation of Mr. Earp? No; because he had in view the securing to each of his children an annual and adequate income, and this could only be effected by leaving the capital of the estate intact. One of the testator's objects would *certainly* be affected by the proposed withdrawal annually of $3000 from the capital of his estate. That is, the direction that the one-fourth of the "*principal of the residue* of his estate" should be held by the trustees for the uses of the will of each of his children, or, in default of either making a will, for those of their respective representatives under the intestate laws. Every dollar withdrawn from this "principal," diminishes the property to be received by these appointees, or representatives to whom, in terms, the principal of the fourth part of the estate bequeathed for life to each of his children, is to go when the life-estates are spent. That such an event was not within the contemplation of the testator, and is absolutely opposed to his intentions, is apparent from the bequest under which the children claim. For, after bequeathing to each of them the income of one-fourth of his residuary estate, he directs, as to each, that "*one-fourth of the principal of his residuary estate*" should go to their appointees by will, or legal representatives; meaning thereby to extend his bounty beyond his own generation. How could this clear intent, thus clearly expressed, be accomplished, if the principal of the bequests, of which his children were to enjoy the usufruct only for life, could, from year to year, be diminished by abstractions for the payment of a life annuitant?

The literal phraseology of the bequest of this annuity, if read in connexion with the whole will, does not justify the construction insisted upon by the exceptants. The annuity to Mrs. Earp is to be paid, by the terms of the bequest, out of the residue of the testator's estate. What is meant by the residue of an estate, when the phrase is used in a will disposing of all a testator's property? It means the rest and remainder of the estate, after satisfying the legal obligations with which it is charged, and all particular legacies. This residue in the present estate is to be held and invested by the executors as trustees, in the manner and on the terms presented by the will. It is out of this residue that Mrs. Earp's annuity is directed to be paid, and not out of the general estate. If the direction had been to pay it out of the general estate, or the will had been silent as to the source from which payment was to be

received, some plausibility would be given to the argument which treats the annuity as a general legacy, and the residue, that which would remain after satisfying the annuity, in common with all the other general legacies. But it is out of the residue that the annuity is to be paid, that is, out of the active fund formed from the mass of the estate, for the general purposes of his will, after the various particular legacies are first paid. In any other view of the subject, how can the residue of income divisible among the children ever be ascertained? If what is meant by the residue of the testator's estate in this will is the balance of principal after the widow's annuity is deducted annually from it, such residue can never be accurately ascertained during her life. Every difficulty on the subject is, however, avoided, in considering that the intention of the testator was, that after his debts and particular legacies were paid, the balance of his estate should form an active fund, out of which the annuity to his wife should first be paid, and the remaining income divided among his children in the manner directed by the will. It is conceded, that the inconvenience or absurdity of a devise is no ground for varying the construction, where the terms of it are unambiguous. But where the intention is obscured by .conflicting expressions, it is to be sought rather in a rational and consistent, than in an irrational and inconsistent purpose : 2 Powell, 7.

So far, the question has been considered simply as one of the intentions of the testator. But it may be considered in another point of view, leading to a similar and perhaps less problematic result. The bequest of this annuity to Mrs. Earp is in lieu of her dower. It is so, as well from the clear intent of the testator, as by force of our Act of Assembly, which makes all devises and bequests by a husband to his wife operate in bar of her dower, unless otherwise expressed. Mrs. Earp has accepted the bequest, and received the first quarter of her annuity. Now, on what is the bequest to a wife of an annual sum in lieu of her dower a charge, where no particular fund is provided for it? It is a charge on the testator's whole estate, giving her a preference over all other legatees ; for her election to accept the legacy places her in the situation of a purchaser, for a valuable consideration, of what is given to her by the will : Burridge v. Bradyell, 1 Peere Wms. 127 ; Blower v. Morrel, 2 Vesey, Sr. 420. When charged on a particular fund, both the principal and interest of that fund are applicable to its payment, though other legatees may be disappointed by the diminution of the principal. The fund upon which such an annual sum

or annuity in lieu of dower is charged, is a surety for its payment, and chancery will most carefully conserve it for this purpose. Where, however, the interest of the fund on which an annuity in lieu of dower is charged, is adequate to its payment, the principal must be left intact to respond to the legatees over. For why should they be disappointed by the useless abstraction of the principal? If the widow receives her annuity, the source from whence it comes, whether from the principal or interest of the fund on which it is charged, is immaterial, except so far as the annual absorption of capital deteriorates the security of her annuity. In this case the progress of such deterioration would be rapid; for, in less than seventeen years, $50,000, the principal of $3000 per annum, would be abstracted from the capital of the fund. In general, the interests of the legatees over of such a fund would be against infringing on the capital. But here the residue, after paying the widow's dower, is devised for life to children, and the ultimate and absolute remainder to their appointees or representatives. The interests, therefore, of those tenants for life, conflict with what will be that of those to whom the principal must ultimately belong. The payment to the widow from the principal, relieves truly the children's portion of the interest of the residue from the charge of the widow's annuity; but it operates with disastrous effect on those to whom the testator intended the principal of his estate should go, after the life interests were exhausted. These are indeed not before the Court— not, perhaps, in being; but does that make it less the duty of this Court to protect those interests? If the testator, with a provident affection for his descendants, as well as towards his immediate offspring, desired that his bounty should extend to the former, why should not his will in this respect be as sacred in the eyes of a Court as in any other? His intention is clear; its object is lawful; and no Court should permit it to be infringed upon by this ingenious method of paying an annuity out of principal.

The authorities on this subject in the books are not direct; because, except in a case circumstanced like the present, the interest of immediate legatees in remainder, and the security of the annuitant, alike would prevent the agitation of the question raised here. But still the authorities sufficiently indicate the usual and ordinary course of chancery in cases like the present.

Thus, in Swallow v. Swallow, 1 Beavan, 432, note, the sum of £400 a year, payable half-yearly, was bequeathed by the testator to Elizabeth Swallow, for life, charged on his whole personal estate. By a codicil he gave her a further legacy of £100 per annum,

2 Q 2

payable out of another fund. The Court ordered that the dividend on $3333.68, which had been transferred into the name of the Accountant-General, should be paid to the legatee to answer the annuity of £100. And afterwards ordered that the dividends on £8000 Navy five per cent. annuities should be paid to her to answer the growing payments of the annuity of £400. The interest on the Navy annuities having been reduced, and the revenue therefrom consequently diminished, a *sufficient* sum of the principal was ordered to be sold from time to time, to pay the annuity in full. The idea of paying the £400 annuity out of the principal, although the whole personal estate was charged with it, does not seem even to have been suggested. In Hoge *v.* Lenen, 2 Beavan, 432, a similar order was made. In Stamper *v.* Pickering, 9 Simons, 176, the testator bequeathed his real estate, charged with an annuity, to his wife in lieu of dower. The land having been sold, and the income *fund* produced by the sale thereof being inadequate to pay the wife's annuity, the *deficiency* of income was ordered to be made up out of the capital.

In Closon *v.* Lawrence et al., 3 Edwards's Rep. 48, it was ruled, that although a will that gives an annuity out of a piece of land does not in terms make it a charge upon the rents, *yet it will be so,* and fall first on the life-estate; and any *deficiency* will remain a charge on the fee, and be raised thereout. "The will," says the Vice-Chancellor, "does not say in terms out of the rents and profits, but in such case the accruing rents and profits will be considered the primary source for the payment of the sum; and in that respect would fall on the tenant for life. If the rents and profits were sufficient, the tenant for life was bound to keep down the annuity, and if the payment were continued after the determination of the life-estate, it would devolve upon the remainder-man to pay it, as the whole estate generally, both for life and fee, stands charged by the will with the payment. So, if, during the existence of the life-estate, the rents and profits were *insufficient* to satisfy the amount, the deficiency would be a charge on the fee, to be raised by mortgage or otherwise out of the capital of the estate." This case in principle is identical with the present. The difference being, that in Closon *v.* Lawrence, the charge in favour of the annuitant was on specified real estate, whereas in our case, the annuity is charged in favour of the widow, on all the residue of the estate, real and personal. There are cases of frequent occurrence in the English Chancery as to how far the Court will extend the rights of annuitants on the principal of an estate charged therewith, in the event

of any inadequacy of income. Such as Arundell v. Arundell, 1 Mylne & Keene, 316; Davis v. Walter, 1 Sim. & Stu. 463; Kendell v. Russell, 3 Simons, 424; Burridge v. Row, 1 You. & Coll. 183; May v. Bennett, 3 Russell, 87. From these cases useful deductions might be drawn, illustrative of the principle now under consideration. But this judgment has already been too much extended to justify us in elaborating further on this point.

On the whole we are of opinion, that whether the will of Robert Earp is considered with regard to the intention of the testator; or to the general rules of equity regulating the administration of such bequests, the annuity to Mrs. Earp is payable in the first place out of the income of his estate.

The second exception to the report of the auditor arises thus: The testator, at the time of his death, was a special partner in the firm of Earp & Brink, in which business concern he had placed a capital of $20,000. In the firm, George Earp, his son, was a partner. By the eighth clause in his will he directs that the business of the firm of Earp & Brink should be continued as it then was, until the 1st of January, 1849, and no longer. And he directs his executors, in case of his death before that period, to charge the sum of $20,000, put into the business by him as a special partner, together with the interest thereof, to be estimated semi-annually to his son George Earp, as a part of his share of his residuary estate thereinafter disposed of. He died November 17, 1848, and before the time he directed the business to be closed, and of course the executors were required by the terms of the will to charge the amount placed by him in the firm to his son George. George Earp claims to consider this as a bequest by his father to him of all his interest in the firm of Earp & Brink, as special partner, and that it carries with it all the proportion of the testator's profits in that concern, as well as the gross sum of capital invested by him therein. The executors of Mr. Earp claim all profits in this business that may have accrued to the testator up to the time of his death, as part of his estate, and treat the bequest to George Earp as if it were a simple bequest of the $20,000; and in this view they have been sustained by the auditor.

In this, however, the Court do not concur. In their opinion, the bequest of the $20,000 invested by the testator in the firm of Earp & Brink to his son, was a specific bequest of his interest as special partner in that firm, and intended to advance him in business. This bequest carried with it the accruing profits, if any existed. Profits in a subsisting partnership, the accounts and

affairs of which are not closed up, are quite different things from interest on invested capital. The former are merely problematical, depending on the prosperous results of the trade, which can never be absolutely ascertained until the business is closed, the debts and liabilities of the partnership satisfied, and accounts taken; a bequest, therefore, of an interest in a continuing partnership, carries with it to the legatee the interest such as it is, whether enhanced in value by profits, or diminished by losses. If on the final winding up of the business, which it seems has not yet actually taken place, although it appears to have been profitable, losses and not profits should appear to be the result of it, George Earp must be charged with this bequest as $20,000 advanced to him of the capital of his patrimony, and has no reclamation on the general estate to indemnify him from such loss. It is true that this bequest to George Earp is not in terms a bequest of the testator's whole interest in the firm of Earp & Brink as special partner; yet it is a bequest of "*the sum of $20,000 put into the business of the firm as special partner*," which the Court think was only another mode of expressing his entire interest therein as special partner. His claim against the firm, as a creditor thereof, is not of course embraced in this bequest. As to the question of interest on this $20,000, this sum must, from the time of the transfer of the testator's interest to George Earp, be considered as so much of the residue of his estate, invested for benefit of the trust, and the interest accruing thereon credited to the general income account of the residue, and does not form any part of the testator's general estate.

The next question raised on the exceptions arises thus: The testator was the owner of stock in the Miners' Bank; of shares in the Lehigh Crane Iron Works; of loans of the Lehigh Navigation and Chesapeake and Delaware Canal Companies; and of the United States. The dividend on the Miners' Bank stock had been declared on the 7th of November, payable after the 17th; the dividend on the Lehigh Crane Iron Works were declared on the 6th of November, and the interest was due in September. These dividends and this interest are clearly part of the testator's general estate. They were sums of money due to the testator, fully ascertained and liquidated. The day of payment was indeed postponed, to suit the convenience of the debtors, but they were, from the time the dividends were declared and interest became due, the fixed and vested property of the testator. If he had been a mere tenant for life of these loans and stocks, the remainder-man

could not certainly have claimed these dividends and this interest, against his executor; and they equally belong to his executor, where he is the absolute proprietor of the investments: 4 Conn. Rep. 182.

The executors also claim that the dividends on the Crane Iron Works, and the interest on the Lehigh and Chesapeake and Delaware Canal loans falling due after the testator's death, shall be apportioned, and that so much of dividend and interest as was earned between the last dividend and the testator's death shall be decided to be part of the principal of his estate. This is resisted on behalf of the legatees, who claim all this dividend and interest as part of the income of the residuary estate, and applicable as such according to the trusts of the will. Questions of this kind most generally arise between the representatives of tenants for life of invested funds and remainder-men. The former claiming that the accruing interest should be apportioned, and paid to them up to the death of their intestate or testator; the latter claiming the entire interest falling due after the principal fund had become their absolute property.

In reference to accruing interest on the public debt, this question has long been settled in England in favour of the remainder-man. The earliest case seems to be Pearly *v.* Smith, 3 Atk. 260, decided in 1755. There one had a life interest in South Sea annuities, which he sold. He died before the Christmas dividend became due; and it was held by Lord Hardwicke, that this dividend could not be apportioned in favour of the purchaser of the life interest, treating the case like one of a common annuity payable half-yearly, where the annuitant dies before the half-year is completed. In Sherrard *v.* Sherrard, 3 Atk. 502 (1747), it was held by the Master of the Rolls (Fortescue), that where money is directed to be laid out in land, and in the mean time invested in government securities, though a tenant for life die in the middle of the half-year, the interest should not be apportioned, but paid over to the reversioner. The same question came again before Lord Hardwicke, in Wilson *v.* Harmer, 2 Ves. Jr. 672 (1755). An authority in favour of apportionment, from Viner's Abr. tit. *Apportionment,* being quoted, Lord Hardwicke expressed his surprise at it, saying that he had never heard of such a rule before, and that he took it "that these dividends go to the person to whom they were due at the time." He, however, consulted the Accountant-General, who said that it was not the practice to make a division of the interest, and that this had been determined by his lordship in 1744. A decree was subsequently

made in favour of the reversioner.   In Rashleigh *v.* Master, 3 Brown Ch. Ca. 101 (1790), the point came before Lord Thurlow, who said that the Court would not apportion dividends ; parties consenting to lay out money in stock, must abide the consequences. In cases, however, of mortgage investments, a different rule seems to prevail; and in such, the interest accruing between the respective days of payment have been apportioned between tenants for life and remainder-man.   This doctrine seems first asserted in Edwards *v.* Warwick, 2 Peere Wms. 171, decided by Lord Macclesfield, in 1723.   The distinction is recognised by Lord Hardwicke, in Pearly *v.* Smith, supra, where he says, "if the security had continued a mortgage, the claimant would have been entitled to the demand he now makes, *because* there interest accrues *every day for forbearance* of the principal, though, notwithstanding, it is usual in mortgages to make it payable half-yearly."   In Sherrard *v.* Sherrard, the same distinction between mortgages and funded debt is recognised.   In Wilson *v.* Harman, this distinction is again adverted to by Lord Hardwicke, who puts it on this clear and intelligible principle, that "interest on a mortgage becomes due *from day to day*, and *mortgagee may call in his money when he will*, and then the interest must be computed up to the day; because no particular time is fixed; but by Act of Parliament, the dividends on these anuuities are made payable on certain days, like rent."   We know, at common law, that annuities were not apportionable : Banner *v.* Lowe, 13 Vesey, 135, was the case of a controversy between the administrator of a tenant for life of the interest of a bond payable half-yearly, claiming an apportionment of accruing interest on the bond, up to the death of his testatrix, and the residuary legatees of the bond, claiming the entire interest since the last half-yearly payment to the tenant for life.   The claim of the administrator of the life recipient of the interest was asserted on the ground that the interest of the bond accrued *de die in diem*.   Lord Eldon sustained this position, and decreed the apportionment, considering the stipulation for payment of interest half-yearly immaterial.   It is not said whether the bond in this case was or was not due, but we may infer that it was due, as Lord Eldon decides the case on the general rule ; which general rule the cases cited show to have been established in cases of mortgage loans *due*, where the creditor could at any time have called in the money, and where, of course, the interest accrued to him daily.   Mr. Coxe, in his note to Hay *v.* Palmer, 2 Peere Wms. 503, denies that Edwards *v.* Warwick, the first of these cases, was a case of apportionment, "since inte-

rest is, in fact, due on a mortgage from day to day. But dividends on the public funds being made payable on certain days, are like rent, and not to be apportioned."

The executors in this case admit that these authorities establish the claim set up by the residuary legatees, so far as respects the dividends accruing from the funded debt of the United States. But as to the funded debt of the Lehigh Navigation and Chesapeake and Delaware Canal Companies, they insist that these must be regarded as analogous to debts owing by individuals on bonds or mortgages, and that interest accruing on them is consequently apportionable between tenants for life and remainder-man.

The ground upon which this difference in the rights of proprietors in different interests of government and corporation loans is supposed to rest, is on some attribute of sovereignty which requires this distinction, in order the better to facilitate the payments at the public treasury. As there is a vast amount of property held among us in the shape of loans created by the United States and our own state, those of other states, loans of municipal corporations, cities, districts, counties, and loans of private corporations, the inquiry as to the true rule by which the rights of the representatives of tenants for life and reversioners in such loans are to be regulated, is a practical question of real value. It certainly is not to be desired that our Court should have two rules to suit a subject; one applicable to national loans and loans created by our own state, and another as to all other funded debts created by other states, or by our own, or other municipal or private corporations. Uniformity and consistency in the rules of action in Courts of justice are things only next in importance to their absolute correctness. If, however, we follow out the principle on which Courts of Chancery have regulated the question before us for more than a hundred years, as manifested by a steady and unbroken current of authority, we shall be relieved from all embarrassment on the subject. It is a mistake to suppose that the rule in equity had any original connexion with government policy or treasury convenience. From the time of its establishment by Lord Hardwicke, in 1744, such an idea is not intimated in any decided case. And this for the very simple reason, that the treasury had no interest on the subject. The loans were personal 'property, and the interest payable to the party in whose name the stock stood, or to his personal representatives, if deceased. As to *how* a trustee in whose name stock stands, the interest of which is for the use of a tenant for life, and afterwards for a reversioner, *should distribute* the interest when received; how, or in what por-

tions he should pay it to the representatives of life tenant and to reversioner, are questions with which the treasury has no connexion.

The true reason for the establishment of the rule is to be sought elsewhere. Funded debt is one of the contrivances of modern ingenuity—whether for good or for ill, this is not the place to discuss. When called into existence, the idea of its permanence and security naturally made it a favourite investment for money, the interest of which was applicable to a series of persons for a long time. And soon the necessity followed for a rule regulating the manner in which interest accruing on such investments should enure, where a life tenant who had an interest in them had died between the dividends. Courts of Equity adopted, as the nearest analogy to be found in past precedents, the rules of law and equity in cases where a life annuitant died before the day of the payment of the annuity had arrived. In such cases apportionment in favour of the representatives of life tenants never had been allowed, neither at law nor in equity: Roper on Leg. vol. 1, ch. 14, p. 589; Croke Eliz. 515; Manning v. Randolph, 1 South. N. J. 144; Franks v. Noble, 12 Ves. 484. This last case being an interest in the nature of an annuity, and not an annuity properly so called. There seems to have been but one exception to this rule, and that arose in annuities given for maintenance, where apportionment has been allowed. Most probably, as in cases of legacies given for maintenance, by parents to children, where interest is allowed from the testator's death, from presumed intention of the donor: Hay v. Palmer, 2 P. Wms. 501. The rule now adopted by this Court is that which prevails in New York: Clapp v. Astor, 2 Ed. 383, which is this: "In general cases of periodical payments becoming due at intervals, and not accruing de die in diem, there can be no apportionment. Annuities, therefore, and dividends from money in the funds, are not apportionable; but interest upon money put on bond and mortgage, notwithstanding it is expressly made payable half-yearly or quarterly, may be apportioned; although it is reserved at fixed periods, the same accrues and becomes due de die in diem for the forbearance of the principal; hence there is no difficulty in making the apportionment for a given time."

No question has been made but that the interest of this testator's wife and children in the residue of his estate commenced with his decease. Payments were made to each on that principle shortly after his death, and are credited to the executors in the distribution account filed by them, and have not been questioned. An annual

sum given to a widow in lieu of dower, as the annuity to Mrs. Earp clearly is, and a proportionate sum *of the income* of the residue to children, must be considered as immediately enuring to the benefit of the legatees, otherwise they might be made to want the first year, in order to add to the principal of the residue; which in such bequests can never be presumed to have been in the testator's contemplation: Beckford *v.* Tobin, 1 Vesey, Sr. 308. In Cledon *v.* Northcote, 2 Vesey, Sr. 346, in the case of his son in a state of unsound mind, the testator cannot be supposed to have intended to leave him one moment without support from the income of his share of the residue.

The Court, for these reasons, differ from the conclusion of the auditor, and are of opinion that the interest on the investments and dividends on the stocks of the testator, falling due after his decease, are part of the income of the residue of his estate, applicable to the trusts of the will respecting the residue, and not part of the general estate.

Before the auditor, a question was made, whether the testator's stock in the Lehigh Crane Iron Works was personal or real estate. The auditor was of opinion that the question did not properly arise in the cause, but still expressed his opinion that this stock was personal and not real estate. The Court agree with him that there is nothing in the case before us which calls for the decision of that question. But we decline expressing any other opinion on the subject. The solution of that question is of no practical value in the cause as now presented. It may never arise at all between the parties. When it does, will be the appropriate time to express our opinions upon it. The report of the auditor must be modified according to the principles of this judgment. It is proper to add, in conclusion, that this proceeding has been an amicable one, instituted to settle doubts entertained as to the true construction of Mr. Earp's will, and to guide the executors and trustees in the future administration of the estate.